UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DARRYL BULLARD, # 341908,

        Petitioner,                                 Case No. 15-cv-12370

v                                                    Honorable Thomas L. Ludington

RANDALL HASS[1],

        Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK TO MODIFY CASE CAPTION, DENYING CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Petitioner Darryl Bullard, a state prisoner, seeks habeas corpus relief under 28 U.S.C. § 2254. Petitioner Bullard is serving a sentence of 45 to 70 years as well as lesser terms for his Wayne Circuit Court jury trial convictions for second-degree murder in violation of M.C.L. § 750.316, felon in possession of a firearm under M.C.L. § 750.224f, and possession of a firearm during the commission of a felony in violation of M.C.L. § 750.224b. The petition raises a single claim: Petitioner's trial counsel was ineffective for failing to request testing of suspected blood found in a vehicle driven by one of the prosecutor's witnesses. Bullard's petition will be denied because the claim was reasonably adjudicated on the merits by the state courts. Petitioner will also be denied a certificate of appealability and denied permission to proceed on appeal in forma pauperis.

---

[1] The case caption to be amended to reflect the name of Petitioner's current custodian, Randall Hass, Warden of the Macomb Correctional Facility.

**I.**

**A.**

The charges filed against Petitioner Bullard arose out of the shooting death of Mario Baker on October 29, 2006. The evidence presented at trial demonstrated that Mario Baker and Terrance Young went to a nightclub with Tommy Brent. Brent got into a fight with other patrons and was injured. Baker and Young failed to help Brent during the fight, angering Brent. Petitioner Bullard knew Brent because his sister had children with him.

Tony Perry, one of the key witnesses for the prosecution, testified that he was with his cousin Jeremiah Perry and Willie Goven at a different night club at the time in question. Perry received a call informing him that Brent had been hurt in a fight. In response, he and Goven drove to the other club to retrieve Brent. The three men then drove back to their neighborhood and parked near Govan's house. Baker and Young soon arrived in Baker's car. According to Perry, Petitioner Bullard also arrived in his car, and was informed about the fight and Baker and Young's failure to assist Brent.

Tony Perry testified that he pushed Baker as he started to get out of his car and told Baker to leave. Then, according to Perry, Petitioner Bullard pulled out a handgun and repeatedly fired into Baker's vehicle. Baker was hit by gunfire, and Young ran. Baker attempted to drive away but crashed into a parked car. Perry ran when the shooting started and saw his cousin, Jeremiah, arrive in his car. Perry got into Jeremiah's car and they circled the block. When they came around all of the other cars were gone. Perry assumed someone was driving Baker to the hospital, so he told Jeremiah to drive there. When they arrived at the hospital they learned that Baker was not there. They drove back to the scene and went inside Govan's house.

Jeremiah Perry's testimony corroborated Tony Perry's testimony. He testified that when he arrived at the scene Baker's car had already crashed into a parked car. Tony jumped into his car and told him that Petitioner Bullard had just shot Baker. Jeremiah testified that he spotted Baker's moving car, but that he could not catch up to it. He drove to the hospital where he assumed Baker was being driven, but, upon discovering that Baker was not at the hospital, they drove back to Govan's house. Jeremiah testified that he heard someone at the house say that Baker's car was parked behind a nearby church. Jeremiah drove to the church and found Baker sitting inside his car gasping for air. Jeremiah found a police officer at a gas station and took him to Baker's car.

Baker died at the hospital from a gunshot wound to the abdomen. Police later found Young's body in a nearby alley. He had been shot ten times in the face. Casings found in the alley and at the scene of the first shooting indicated that both men were killed by the same gun.

Helen Taylor, who lived with Govan, testified that she heard the men talking about the shooting, and that she heard someone mention Petitioner Bulllard's name as the shooter.

**B.**

At trial, the defense theory was that Bullard was not the shooter and that Tony Perry was. Defense witnesses Tiffany Gilmer and Demetrius Gipson testified that they saw Perry fire the shots into Baker's vehicle. Eric Blackwell and Cleotha Maxwell testified that they were with Petitioner Bullard at the time of the shooting at a different night club, and that Petitioner Bullard and Cleotha later spent the entire night at Blackwell's home.

Relevant to the defense theory was the testimony of a police officer who testified that he had observed a red smear of suspected blood in Govan's vehicle. The police officer testified that

a blood sample was collected, but that it was not sent to the lab for testing. The officer in charge of the case had not asked Govan about the suspected blood found in his car.

During closing arguments, Defense counsel attacked the quality of the police investigation. *See* ECF No. 12 Ex. 14 at 57-65. As part of that line of argument defense counsel stated:

> Where did [Govan] go? What was he doing? He was chasing Terrance Young down and killing him, just like he helped kill Mario Young -- Mario Baker. I'm sorry. That's what happened. That's why he wasn't outside.
>
> That's why when I start talking about suspected blood that was taken out of Willie Govan's car -- now I've had root canals that were less painful and less trouble than it was to get Sergeant Williams to bring in this to show you. This is the blood sample, suspected blood sample that was taken out of Willie Govan's car out of the front seat. Whose blood is this? Is it Mario Baker's blood? Is it Terrance Young's blood? Whose? And why is it in the car?
>
> He didn't send it to the lab to get it tested, it was collected. First time the envelope was opened was a little over an hour ago when the sergeant was on the stand. Hasn't been opened since it was collected. What an outrage. What an outrage.
>
> Is he afraid of the answer? What if this is Mario Baker's blood? What would Mario Baker's blood be doing in Willie Govan's car if he wasn't there? What if it's Terrance Young's blood? What would Terrance Young's blood be doing in Willie Govan's car if he wasn't killing him? What? Do we have an answer for that?
>
> At the beginning of this trial, what did I tell you? I told you, I don't have to prove anything. This is their case. They have the burden of proof. And at the end of this case if they haven't done what they were supposed to do with the evidence, I wasn't going to be ashamed to come in and say, well, no, this isn't my job to send this to the lab. It's my job to tell you it wasn't and that it should have been, that is my job. But it wasn't done. Why not?

*Id.*, at 63-64.

## C.

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals. His appellate counsel filed a brief raising three claims, none of which are

being presented in this petition. Petitioner also filed a supplemental pro se brief raising five additional claims, one of which now forms his sole habeas claim. The Michigan Court of Appeals rejected Petitioner's claims and affirmed his conviction in an unpublished opinion. *People v. Bullard*, No. 299876, 2013 WL 132706, at *1 (Mich. Ct. App. Jan. 10, 2013).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which raised the same claims as in the Michigan Court of Appeals. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Bullard*, 832 N.W.2d 239 (Mich. 2013) (unpublished table decision).

Petitioner then returned to the trial court and filed a motion for relief from judgment, raising three new claims not presented in this action. The trial court denied the motion by order dated March 4, 2014. Petitioner appealed that decision through the state appellate courts, but his applications for leave to appeal were denied. *People v. Bullard*, No. 321266 (Mich. Ct. App. June 10, 2014); *People v. Bullard*, 856 N.W.2d 23 (Mich. 2014) (unpublished table decision).

## II.

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases: An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court adjudication is contrary to Supreme Court precedent under § 2254(d)(1) if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or (2) " the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result]." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal quotation marks omitted). A state court adjudication involves an unreasonable application of federal law under § 2254(d)(1) if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008) (internal quotation marks omitted).

"In order for a federal court to find a state court's application of [Supreme Court] precedent unreasonable, the state court's decision must have been more than incorrect or erroneous," but rather "must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotations and citations omitted):

> [E]ven clear error will not suffice. Rather, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citations, quotation marks, and alterations omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "Federal habeas review thus exists as 'a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). "[W]hether the trial judge was right or

- 6 -

wrong is not the pertinent question under AEDPA." *Renico v. Lett*, 559 U.S. 766, 778 n.3 (2010). Rather, the pertinent question is whether the state court's application of federal law was "objectively unreasonable." *White*, 134 S. Ct. at 1702. In short, the standard for obtaining federal habeas relief is "difficult to meet . . . because it was meant to be." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (internal quotation marks omitted).

**A.**

Petitioner now claims that his counsel was ineffective for failing to have the suspected blood stain collected from Govan's car tested. He asserts that if testing had indicated that it was blood belonging to Baker or Young, it would have undermined the prosecutor's case and strongly supported the defense theory that Tony Perry and Govan were the perpetrators. Respondent asserts that the Michigan Court of Appeals reasonably decided the claim against Petitioner on the merits.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner's counsel was ineffective. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment. *Id*. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial. *Id*.

With respect to the performance prong, a petitioner must identify acts that are "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The Court's scrutiny of counsel's performance is viewed through a highly deferential lens. *Id*. at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment. *Id*. at 690. And it is the petitioner who bears the burden of overcoming the presumption that his counsel's actions constituted sound trial strategy. *Id*. at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id*. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Id*. at 686.

Because the state courts rejected this claim on the merits, however, it is beyond the scope of review for this Court to evaluate Petitioner's claim de novo under the *Strickland* standard. The issue here is much more narrow. The question is whether the conclusion reached by the state court falls within the bounds of reasonable adjudications of Petitioner's claims — a substantially higher threshold. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123.

**B.**

On direct appeal, the Michigan Court of Appeals rejected Petitioner's claim on the merits under *Strickland's* first prong. The Court of Appeals found that Petitioner's trial counsel's decision not to have the stain tested was reasonable:

> Defendant challenges defense counsel's failure to push to have Govan's car examined prior to trial. Testimony at trial indicated that Perry was with Govan at the time of the shooting. The defense theory was that Perry shot Baker. There was evidence that a bullet hole was discovered on the hood of Govan's car and that a

> red smear, possibly blood, was discovered inside the car. A sample of the smear was collected, but it was never tested to confirm whether it was blood or to determine who it may have belonged to. At trial, defense counsel extensively questioned the officer in charge of the investigation about the suspected blood found in Govan's car and whether it had been tested. During closing argument, defense counsel argued that it was an "outrage" that the police did not test the sample.
>
> Defendant now argues that defense counsel was ineffective for not investigating the blood evidence from Govan's vehicle before trial. Counsel was aware of the evidence and knew that it had not been analyzed. Defendant argues that counsel should have requested that the sample be tested, but counsel's decision not to pursue testing was a strategic decision. Testing may have shown that the blood was not connected to either Baker's or Young's shooting, and risked eliminating Govan as a possible suspect or accomplice in the shooting. The absence of testing enabled defense counsel to attack the adequacy of the police investigation and to present different plausible explanations for the meaning and significance of the suspected blood evidence to aid in creating a reasonable doubt concerning defendant's guilt.

*People v. Bullard*, No. 299876, 2013 WL 132706, at *8.

    This decision by the Michigan Court of Appeals is reasonable. *See Knowles,* 556 U.S. at 123. By not testing the blood sample found in Jerimiah's car, trial counsel preserved a forceful argument attacking the adequacy of the police investigation and allowed for the possibility that the blood belonged to one of the victims, thus creating a basis for a reasonable doubt argument. A decision to have the evidence tested would have reduced the force of the argument attacking the investigation, and would have either led to the discovery of highly exculpatory evidence or reduce the force of the defense theory.

    Either course of action amounted to a gamble, but leaving the untested evidence alone was not unreasonable given the fact that the prosecutor bears the burden of proving a defendant guilty beyond a reasonable doubt. The presumption of innocence allowed defense counsel to use the mere *possibility* that testing would lead to exculpatory evidence to work for the defendant as

a basis for creating a reasonable doubt, and it provided a basis for attacking the quality of the police investigation.

Courts faced with claims involving a defense attorney employing this basic strategy consider it to be a reasonable one. See *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 755 (11th Cir. 2010) (counsel attacked adequacy of police investigation, stating state serologist's failure to test some of the blood at the murder scene was inexcusable); *Grisby v. Blodgett*, 130 F.3d 365, 372-73 (9th Cir. 1997) (counsel's failure to order blood test was not ineffective where test results might not be exculpatory); *Carbonell v. Falk*, 546 Fed. Appx. 792, 795-796 (10th Cir. 2013); *Smith v. Wasden*, 2012 U.S. Dist. LEXIS 35502 (D. Idaho Mar. 14, 2012) ("It is not unreasonable for a defense attorney to poke holes in the adequacy of the police investigation while forgoing another round of scientific examination on evidence that might provide results that incriminate the defendant").

The record shows that Petitioner's trial attorney made a deliberate strategic decision not to have the evidence collected from Govan's car tested. His strategy was to cast Perry and/or Govan as the killers. He supported this theory with two eyewitnesses who testified that they saw Perry shoot into Baker's car. The presence of suspected blood in Govan's car supported his theory that Perry or Govan drove in Govan's car to hunt down and kill Young after Perry shot Baker. If the evidence had been tested and revealed that it was not Baker or Young's blood, then this defense theory would have been diminished or eliminated. And while a positive test result certainly would have devastated the prosecutor's case, it is not a gamble every reasonable defense attorney would make.

The Supreme Court has stated "[a]n attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 562 U.S. at 108. Here,

the record reasonably supports the conclusion reached by the Michigan Court of Appeals that trial counsel's decision not to have the purported blood sample tested constituted adequate performance. Given the deference due to the state court under § 2254(d), Petitioner has not demonstrated entitlement to habeas relief.

### III.

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. The Court further concludes that Petitioner should

not be granted leave to proceed *in forma pauperis* on appeal, as any appeal would be frivolous. *See* Fed. R. App. P. 24(a).

### IV.

Accordingly, it is it is **ORDERED**, that Bullard's petition for a writ of habeas corpus, ECF No. 1, is **DENIED**.

It is further **ORDERED** that the Clerk is **DIRECTED TO AMEND** the caption to reflect the substitution of "Randall Hass" as a defendant in place of defendant Paul Klee.

It is further **ORDERED**, that a certificate of appealability is **DENIED**.

It is further **ORDERED**, that permission to appeal in forma pauperis is **DENIED**

                                                 s/Thomas L. Ludington  
                                                 THOMAS L. LUDINGTON  
                                                 United States District Judge

Dated: June 10, 2016

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 10, 2016.

                      s/KIM GRIMES  
                      Kim Grimes Acting in the Absence of  
                      Michael A. Sian, Case Manager